CIBA–GEIGY CORPORATION, Plaintiff,

v.

ALZA CORPORATION and Marion Merrell Dow Inc., Defendants.

Civ. A. No. 91–5286.

United States District Court, D. New Jersey.

Oct. 5, 1994.

As Amended Oct. 24, 1994.

Robert Fettweis, Fleming, Roth & Fettweis, Newark, NJ, and Arthur D. Gray, James Galbraith, Kenyon & Kenyon, New York City, for plaintiff.

George J. Kenny, Lisa M. Walsh, Connell, Foley & Geiser, Roseland, NJ, and Thomas V. Heyman, Theresa M. Gillis, Jones, Day, Reavis & Pogue, New York City, for defendants.

## *OPINION*

WOLIN, District Judge.

Before the Court is the motion by defendants Alza Corporation ("Alza") and Marion Merrell Dow Inc. ("MMD") (collectively "defendants") for summary judgment on the ground that plaintiff Ciba-Geigy Corporation's patent is invalid. Defendants argue plaintiff's patent was anticipated under 35 U.S.C. § 102(b) and obvious under 35 U.S.C. § 103. For the reasons expressed below, this Court will grant defendants' motion for summary judgment on the ground that plaintiff's patent was anticipated by a prior printed publication under 35 U.S.C. § 102(b).

## BACKGROUND

Plaintiff Ciba-Geigy brought an action against defendants alleging infringement of U.S. Patent No. 5,016,652 (the '652 patent). Ciba-Geigy produces HABITROL under the '652 patent, a nicotine patch that helps people quit smoking. Plaintiff alleges that defendants' NICODERM product, also a nicotine patch that helps people quit smoking, infringes on Claims 1, 2, 4, 5 and 7 of the '652 patent. Defendants counterclaim for a declaration that the '652 patent is invalid.

Drs. Murray Jarvik, Karce Rose, and Jed Rose are the inventors of the '652 patent. The Veterans Administration (the "V.A."), and Regents of the University of California (the "Regents"),[1] employed Drs. Murray Jarvik and Jed Rose while they were developing the '652 patent. Dr. Karce Rose was in private practice.

Plaintiff's application for the '652 patent, entitled "Method and Apparatus for Aiding in the Reduction of Incidence of Tobacco Smoking," was filed on April 25, 1985. The '652 patent describes a transdermal patch for the application of nicotine from the skin to the bloodstream of the user.

On January 19, 1984—more than one year prior to the filing of the application for the '652 patent—*Nature* magazine published a letter to the editor from Dr. Cecil H. Fox in which he discussed various ways nicotine could be introduced into the bloodstream:

> Alternative routes of drug administration more cosmetic than chewing tobacco or snuffs should be developed so that the nicotine addict has alternatives to cigarettes. Nicotine chewing gum has had limited success, but may soon become available worldwide. Another alternative might be transdermal application much in the manner of nitroglycerine [sic] and scopolomine [sic] patches.[2] Nicotine "inhalers" might also be feasible if dosage could be adjusted.

> I would appreciate receiving correspondence from individuals or groups actively engaged in finding alternative methods of nicotine delivery in humans.

---

1. This Court earlier granted the motion of counterclaim defendant Regents, to dismiss defendants' counterclaim under the Eleventh Amendment's grant of sovereign immunity and denied defendants' motion to dismiss the complaint for lack of standing. *Ciba-Geigy Corp. v. Alza Corp,* 804 F.Supp. 614 (D.N.J.1992).

2. Scopolamine transdermal patches are used to relieve the symptoms of motion sickness. Nitroglycerin transdermal patches are used to treat angina.

Cecil H. Fox, *Nicotine Delivery,* Nature, Jan. 19, 1987, at 205 (hereinafter "Fox letter"). It is this letter that defendants argue anticipates the '652 patent.

The Fox letter was not presented to the Patent and Trademark Office ("PTO") when the inventors sought approval of the '652 patent. When the PTO was finally apprised of the Fox letter, the PTO unequivocally found the Fox letter was an anticipatory reference to a separate patent for a transdermal nicotine patch.

Dr. Brian Barry, a professor of Pharmaceutical Technology at the University of Bradford in England,[3] submitted an affidavit in which he attests that: "The Fox letter expressly teaches one to put nicotine into an existing patch. One skilled in the art could simply follow this teaching by substituting nicotine for nitroglycerin in the Transderm®–Nitro patch and arrive at exactly the patch of Claims 1 and 2 of the '652 patent." Dr. Barry then attests that he performed an experiment in which he removed the nitroglycerin from an existing transdermal nitroglycerin patch, inserted nicotine and created a transdermal nicotine patch *exactly* as described in Claims 1 and 2 of the '652 patent.

## DISCUSSION

### I. SUMMARY JUDGMENT

#### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Hersh v. Allen Products Co.,* 789 F.2d 230, 232 (3d Cir.1986). A dispute involving a material fact is "genuine" only "if the evidence is such that a reasonable jury would return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Supreme Court also observed

that "[o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude an entry of summary judgment." *Id. See also Ness v. Marshall,* 660 F.2d 517, 519 (3d Cir.1981) (role of district court is to determine whether genuine issue of material fact exists).

■ Furthermore, when considering a summary judgment motion, this Court must view all evidence submitted in a light most favorable to the party opposing the motion. *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986); *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). Although the summary judgment hurdle is a difficult one to meet, it is by no means insurmountable.

Accordingly, in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court concluded that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–324, 106 S.Ct. at 2552.

#### B. Summary Judgment in Patent Infringement Litigation

■ The fact that this lawsuit involves the validity of a patent does not render this case unsuitable for disposition by summary judgment. Although patent infringement cases often raise complex factual issues, "the rules do not change simply because the case involves patent law." *Aid Pack, Inc. v. Beecham, Inc.,* 641 F.Supp. 692, 694 (D.Mass. 1986), *aff'd,* 826 F.2d 1071 (Fed.Cir.1987) (citing *D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 1573 (Fed.Cir.1985)). "Summary Judgment is appropriate in patent cases as in other cases under Rule 56(c)." *Procter & Gamble v. Nabisco Brands Inc.,* 711 F.Supp. 759 (D.Del.1989).

---

**3.** Dr. Barry is also head of the Pharmaceutics and Pharmacognosy Sections of the School of Pharmacy and Dean of the Faculty of Natural and Applied Sciences at the University of Bradford.

Similarly, the rules for summary judgment do not change simply because this case involves the issue of anticipation. Although there is a line of authority holding that the issue of anticipation is generally a question of fact, the non-moving party still bears the burden of showing this Court a disputed issue of material fact. *See e.g., Westvaco v. International Paper Co.,* 991 F.2d 735 (Fed. Cir.1993); *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613 (Fed.Cir.), *cert. denied,* 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985).

Courts in this Circuit have granted summary judgment specifically on the issue of anticipation, where there was no genuine issue of material fact. For example, in *Procter & Gamble v. Nabisco Brands Inc.,* 711 F.Supp. 759 (D.Del.1989), the court granted partial summary judgment on the issue of anticipation finding a patent on a cookie that was chewy on the inside and crispy on the outside was anticipated by a previously published recipe.

In fact, the Federal Circuit repeatedly has upheld the grant of summary judgment in patent infringement cases where there was no genuine issue of material fact. *See, e.g., George v. Honda Motor Co. Ltd.,* 802 F.2d 432, 434 (Fed.Cir.1986); *Porter v. Farmers Supply Service Inc.,* 790 F.2d 882, 884 (Fed. Cir.1986); *Brenner v. United States,* 773 F.2d 306 (Fed.Cir.1985); *Builders Concrete, Inc. v. Bremerton Concrete Products Co.,* 757 F.2d 255 (Fed.Cir.1985); *Prodyne Enterprises Inc. v. Julie Pomerantz Inc.,* 743 F.2d 1581 (Fed.Cir.1984); *Molinaro v. Fannon/Courier Corp.,* 745 F.2d 651, 654 (Fed. Cir.1984).

Thus, the Federal Circuit has advised: "[w]here no issue of material fact is present . . . courts should not hesitate to avoid an unnecessary trial by proceeding under Fed. R.Civ.P. 56 without regard to the particular type of suit involved." *Chore–Time Equipment v. Cumberland Corp.,* 713 F.2d 774, 778–79 (Fed.Cir.1983).

"In accordance with *Chore–Time,* it is incumbent on the trial judge to look beyond mere denials or arguments with respect to issues of scope and content of prior art, difference between the prior art and the invention in suit, level of skill in the art or other factual issues." *Union Carbide Corp. v. American Can Co.,* 724 F.2d 1567 (Fed. Cir.1984).

It is with these tenets in mind that the Court considers defendants' summary judgment motion.

**C. Plaintiff's Summary Judgment Objections**

Plaintiff argues that resolution of the anticipation issue is a question of fact because it is unclear how one skilled in the art would interpret the Fox letter. The defendant introduced the affidavit of Dr. Barry, a scientist skilled in the art,[4] who attested that the Fox letter taught him how to make a transdermal nicotine patch exactly as described in Claims 1 and 2 of the '652 patent, by removing the nitroglycerin from an existing patch and inserting nicotine. Barry Aff. at 5.

■ Plaintiff failed to introduce any evidence to contradict this material fact. The Court recognizes the affidavit testimony by Dr. Enscore[5] on behalf of the plaintiff:

Because drugs have dramatically different chemical, physical and pharmacological properties, one cannot simply take a transdermal patch for nitroglycerin, for example, replace the nitroglycerin with nicotine, and expect to have a device that administers nicotine *at the same rates and duration.*

Enscore Aff. ¶ 16 (emphasis added). Dr. Enscore does not indicate that a nicotine patch made from a nitroglycerin patch would not work at all. Rather, Dr. Enscore merely states that such a patch would not deliver nicotine "at the same rate and duration" as nitroglycerin. Thus, Dr. Enscore's statement does not contradict Dr. Barry's statement that he could make a nicotine patch

---

**4.** A person skilled in the art in this case is one who is skilled in the science of delivering drugs transdermally.

**5.** Dr. Enscore is a Senior Research Fellow and Executive Director—Oral Cavity Products at Alza Corporation.

using an existing nitroglycerin patch. The fact that such a patch would work less than perfectly is not a genuine issue of material fact for the purpose of deciding the issue of anticipation.

■ Similarly, the plaintiff introduced the affidavit of inventor Dr. Jed E. Rose who testified that membranes in other existing patches would not work well with nicotine:

It is important to note that a transdermal patch consists of a rate limiting membrane which is made up of microscopic pores of a certain size and density. Each membrane is specifically designed for a particular drug. Thus, one could not purchase a patch designed for one drug and merely replace the drug with nicotine, as the compatibility of the chemical and rate absorption could be radically different among the different patches.

Jed E. Rose Aff. at 6. This statement also fails to contradict the testimony of Dr. Barry that he could make a transdermal nicotine patch using existing transdermal nitroglycerin patches. Moreover, Dr. Rose's affidavit testimony is contradictory to the prosecution history of the '652 patent in which Dr. Rose and the other inventors specifically asserted that existing membranes could be used in connection with the patented invention: "Some of the rate controlling membranes which can be employed are microporous films as for example, those membranes taught in the U.S. Patent No. 4,060,084." Col. 7, lines 11–14. More importantly, the '652 patent expressly suggests incorporating nicotine into existing transdermal patches:

Other forms of dermally applicable patches which can be used in connection with the present invention are illustrated for example in U.S. Patent No. 3,797,494 to Zaffaroni, U.S. Patent No. 3,731,683 to Zaffaroni and U.S. Patent No. 4,336,243 to Sanvordeker et al.

Col. 5, lines 17–21. Thus, the '652 patent is not based on any new patent construction or any new membrane construction. Rather, the '652 patent broadly covers transdermal patches that contain nicotine.

Dr. Rose's testimony does not raise any material issue of fact for trial because it fails to contradict Dr. Barry's testimony and is contradictory to the prosecution history of the '652 patent. "When, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier ... testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists." *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991); *see also, Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703 (3d Cir.1988).

Plaintiff has offered nothing more than mere denials and arguments in its attempt to create a genuine issue of material fact. The Enscore and Rose affidavits "expressed no more than an unsupported conclusory opinion which ignored, rather than conflicted with, the evidence of the record." *Union Carbide*, 724 F.2d at 1572. Thus, this Court concludes that there is no material issue of fact to warrant a trial on the issue of anticipation. "A trial on this issue would undoubtedly produce more arguments, but no more enlightment." *Id.* at 1573.[6]

## II. DOES THE FOX LETTER ANTICIPATE THE '652 PATENT?

### A. Standard for Anticipation

Under 35 U.S.C. § 102(b), a patent is invalid as anticipated if the claimed invention:

was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

Courts have interpreted Section 102(b) to require that "each and every element as set forth in the claim [be] found, either expressly or inherently described, in a single prior art reference." *Constant v. Advanced Micro–Devices Inc.*, 848 F.2d 1560, 1570 (Fed.Cir.), *cert. denied*, 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988); *see also Minnesota Mining and Mfg. v. Johnson and Johnson*

6. During oral argument plaintiff stated that it had no additional witnesses to call at trial, other than those whose affidavit testimony was presented to the Court. September 12, 1994, Hearing Transcript at 29.

*Orthopaedics Inc.*, 976 F.2d 1559 (Fed.Cir. 1992).

■ Defendants must prove anticipation by clear and convincing evidence. *Texas Instruments v. United States Int'l Trade Comm'n*, 988 F.2d 1165 (Fed.Cir.1993) ("A patent is presumed valid and the party asserting invalidity must overcome this presumption by clear and convincing evidence establishing the facts which support the conclusion of invalidity."); *see also Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 834 (Fed.Cir.1991); *Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809, 106 S.Ct. 1578, 89 L.Ed.2d 817 (1986).

■ To determine whether the '652 patent is anticipated by the Fox letter under Section 102(b), the Court must undertake a three-step analysis. The first step is construction of the claims to determine their meaning in light of the specification and prosecution history. The second step requires the Court to compare the properly construed claims with the subject matter described in the prior art reference and identify the corresponding elements disclosed in the allegedly anticipating reference. *Titanium Metal Corp. of Am. v. Banner*, 778 F.2d 775, 782 (Fed.Cir.1985). The third step requires the Court to determine whether the prior art reference is enabling, placing the allegedly disclosed matter in the possession of the public. *Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471, 1479 (Fed. Cir.1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987). Thus, a prior art reference in a printed publication cannot anticipate an invention under Section 102(b) unless it enables one skilled in the art to produce the invention described in the patent.

## B. The '652 Patent

■ Claim 1 of the '652 patent is directed to a transdermal nicotine patch with the following elements:

1. A patch adapted for application to the skin of a user for the transdermal administration of nicotine to the user, said patch comprising:

(a) an outer layer which is impermeable to the passage of nicotine,

(b) an inner layer adapted to be placed on the surface of a user's skin, said inner layer being sufficiently porous to enable the passage of nicotine therethrough for transdermal application to the bloodstream of a user,

(c) means associated with said patch to enable said patch to be temporarily and releasably attached to the skin of a user, and

(d) said outer layer and said inner layer forming a nicotine receiving area for receiving nicotine to allow the nicotine to pass through the inner layer.

Claim 2 of the '652 patent states: "The patch of claim 1 further characterized in that said patch is provided with a membrane in the nicotine receiving area to receive and enable a release of the nicotine."

Claim 4 describes a transdermal nicotine patch with the following elements:

(a) a dermally applicable pad,

(b) nicotine contained by said dermally applicable pad in such a manner that is it dispensable at a controlled rate,

(c) means for applying the patch to the skin of the person to whom smoking reduction is desired, and

(d) a rate controlling membrane on said pad adapted to be placed adjacent a user's skin to allow the nicotine in the patch to transdermally migrate into the person's bloodstream at a rate sufficient to correspond to the nicotine level in the blood achieved by smoking.

Claim 5 states: "The patch of claim 4 further characterized in that said patch comprises at least 8 milligrams of nicotine therein."

Claim 6 states: "The patch of claim 4 further characterized in that said patch comprises a sufficient amount of nicotine and which is delivered at a rate to produce a level of about 10 nanograms of nicotine per milliliter of blood at the start of smoking reduction program."

Claim 7 states: "The patch of claim 4 further characterized in that said patch com-

prises a sufficient amount of nicotine and is constructed to transdermally administer the nicotine from the pad to maintain about 50 to about 250 micrograms of nicotine in the bloodstream."

### C. The Fox Letter

Defendants claim that the '652 patent is invalid under Section 102(b) because it was anticipated by the Fox letter, which was written on January 19, 1984—more than one year prior to the filing of the application for the '652 patent. Dr. Fox's letter to the editor of *Nature* magazine discussed various ways nicotine could be introduced into the bloodstream that were "more cosmetic than chewing tobacco or snuffs." Fox letter at 205. Dr. Fox recognized that the prior art in this field included nicotine chewing gum. *Id.* However, Dr. Fox suggested that an improvement over nicotine chewing gum would be a nicotine transdermal patch. *Id.* In fact, Dr. Fox specifically suggested that existing transdermal patches, used to deliver other drugs to the bloodstream, could be used to deliver nicotine to the bloodstream: "Another alternative might be transdermal application much in the manner of nitroglycerine and scopolamine patches." *Id.*

### D. Dr. Barry's Experiment

Defendants argue that the Fox letter teaches a person of ordinary skill how to make a transdermal nicotine patch using existing nitroglycerin and scopolamine patches. In addition, defendants argue that by referencing nicotine chewing gum, the Fox letter teaches a person of ordinary skill where to look to determine how much nicotine is needed in the bloodstream to satisfy a smoker.

In support of their argument, defendants offered the testimony of Dr. Barry. Dr. Barry testified that: "The Fox letter expressly teaches one to put nicotine into an existing patch. One skilled in the art could simply follow this teaching by substituting nicotine for nitroglycerin in the Transderm®–Nitro patch and arrive at exactly the patch of claims 1 and 2 of the '652 patent." Barry Aff. at 5. Dr. Barry also testified that he performed an experiment in which he removed the nitroglycerin from an existing

transdermal patch for nitroglycerin, wiped the area clean with a Q–Tip, inserted nicotine, resealed the patch and created a transdermal nicotine patch *exactly* as described in claims 1 and 2 of the '652 patent. Barry Aff. at 8–9.

### E. Extrinsic Evidence

In order to produce a transdermal nicotine patch that delivers the necessary amount of nicotine to the user to simulate smoking, Dr. Barry was forced to consider extrinsic evidence outside the Fox letter. In this case, Dr. Barry looked to the following items of extrinsic evidence to interpret the Fox letter:

1. Articles that discuss how much nicotine must be present in the bloodstream to have an effect on the body.

2. The Transderm®–Nitro leaflet to learn how much nitroglycerin was contained in this patch.

Barry Aff. at 6–9.

The question is whether the use of this extrinsic evidence means the Fox letter is not an anticipatory reference. Plaintiff argues that Dr. Barry's use of extrinsic evidence is proof that the Fox letter does not identify all of the elements of Claims 1 and 2 of the '652 patent in a single reference as required by Section 102(b).

Extrinsic evidence may be considered to explain, but not expand on, the meaning of an anticipatory reference. *In re Baxter Travenol Labs,* 952 F.2d 388, 390 (Fed. Cir.1991); *Scripps Clinic & Research Fdn. v. Genentech Inc.,* 927 F.2d 1565, 1576 (Fed.Cir. 1991) (criticized on other grounds, *Atlantic Thermoplastics Co. v. Faytex Corp.,* 970 F.2d 834 (Fed.Cir.1992)). Specifically, the Court may look to extrinsic evidence to learn how the person of ordinary skill would interpret an anticipatory reference:

It is sometimes appropriate to consider extrinsic evidence to explain the disclosure of a reference. Such factual elaboration is necessarily of limited scope and probative value, for a finding of anticipation requires that all aspects of the claimed invention were already described in a single reference: a finding that is not supportable if it is necessary to prove facts beyond those

disclosed in the reference in order to meet the claim limitations. The role of extrinsic evidence is to educate the decision-maker to what the reference means to persons of ordinary skill in the field of the invention, not to fill gaps in the reference. *Scripps Clinic*, at 1576. *See also Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264 (Fed.Cir.1991) (Extrinsic evidence may be used "where the common knowledge of technologists is not recorded in the reference; that is, where technological facts are known to those in the field of the invention, albeit not known to judges.").

■ The extrinsic evidence relied on by Dr. Barry does not expand the Fox letter but merely reveals the technical knowledge available to persons of ordinary skill in the field. A person of ordinary skill in this field would inherently know where to look to learn about nicotine levels in blood and would know to look at the leaflet to learn how big the drug reservoir was in an existing patch. This extrinsic evidence does no more than indicate knowledge readily available to persons of ordinary skill in the field. It is therefore, appropriate, to consider this extrinsic evidence when interpreting the Fox letter.

### F. Identity of the Invention

Once the proper scope of the claims has been determined, a party asserting that a patent claim is anticipated under Section 102(b) must demonstrate, *inter alia*, identity of the invention. As the Federal Circuit has held: "each and every element as set forth in the claim [must be] found, either expressly or inherently described, in a single prior art reference." *Constant v. Advanced Micro–Devices Inc.*, 848 F.2d 1560, 1570 (Fed.Cir.), *cert. denied*, 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988); *see also Minnesota Mining and Mfg. v. Johnson and Johnson Orthopaedics Inc.*, 976 F.2d 1559 (Fed.Cir. 1992).

■ Plaintiff argues that because the Fox letter uses the word "might" it fails to teach anything, but is a "mere speculation and conjecture." Opp.Br. at 17. Plaintiff

also argues that because Dr. Fox sought correspondence on this topic, his letter was "merely a curious inquiry" and not a teaching. *Id.* However, the tenor of the letter is not relevant under Section 102(b). All that matters is whether the Fox letter identifies the invention described in Claims 1 and 2 of the '682 patent.

■ Claims 1 and 2 of the '652 patent describe a transdermal nicotine patch. According to Dr. Barry each and every element of the transdermal nicotine patch described in Claims 1 and 2 of the '652 patent is present in the existing Transderm®–Nitro patch referred to in the Fox letter.[7] Barry Aff. at 5. Specifically, Dr. Barry testified that the Transderm®–Nitro patch has:

1. An outer layer which is impermeable to the drug. (element (a) of Claim 1).

2. A membrane permeable to the drug. (either element (b) of Claim 1 or the membrane of Claim 2).

3. An adhesive which (i) is the inner layer placed on the surface of the user's skin and through which the drug passes and (ii) allows the patch to be temporarily and releasably attached to the skin (elements (b) and (c) of Claim 1).

4. A drug reservoir between the inner and outer layers (element (d) of Claim 1).

Barry Aff. at 5.

Plaintiff introduced no evidence to dispute Dr. Barry's assertion that the Transderm®–Nitro patch has all of the elements of Claims 1 and 2 of the '652 patch.

Because the Fox letter inherently describes the Transderm®–Nitro patch which contains all of the elements of Claims 1 and 2 of the '652 patent, there can be no doubt that the Fox letter identifies Claims 1 and 2 of the '652 patent.

### G. Enablement

In addition to identity of invention, anticipation requires that a prior art reference

---

**7.** The Fox letter expressly suggests inserting nicotine into existing transdermal patches used for nitroglycerin. One such patch is the Transderm®–Nitro patch. Therefore, the Fox letter "inherently describes" the Transderm®–Nitro patch.

must be enabling. That is the prior art reference must enable the person of ordinary skill to make the invention. *Akzo,* 808 F.2d at 1479.

■ Prior art references are presumed to be enabling. *In re Sasse,* 629 F.2d 675, 681 (C.C.P.A.1980). Therefore, plaintiff bears the burden of proving that the Fox letter was not enabling.

■ Plaintiff makes several arguments as to why the Fox letter does not enable one skilled in the art to create a transdermal nicotine patch as described in Claims 1 and 2 of the '652 patent. First, plaintiff argues that the Fox letter fails to indicate whether using an existing transdermal patch would be operative. Opp.Br. at 17. Second, plaintiff argues that the Fox letter does not indicate which of several transdermal patches should be used. Opp.Br. at 19. They note that it was fortuitous that Dr. Barry chose the Transderm®–Nitro patch and not one of the other patches. Dr. Barry himself testified at his deposition that other types of transdermal patches may not have been able to deliver nicotine. Opp.Br.Ex. N at 98–99. Finally, plaintiff argues that there is nothing in the Fox letter that indicates whether existing patches would deliver the correct dosage of nicotine to satisfy a smoker's demand for nicotine and whether existing patches would deliver the nicotine, with sufficient rapidity to satisfy a smoker. Opp.Br. at 18–21.[8] Thus, plaintiff argues the Fox letter does not enable a person of ordinary skill to make a transdermal nicotine patch.

The Court finds each of the plaintiff's arguments is irrelevant. The Barry experiment indicates that a person of ordinary skill could read the Fox letter and learn to take an existing transdermal patch and make a transdermal nicotine patch. The Barry experiment reveals that a person of ordinary skill would know to read the literature regarding nicotine in plasma to determine how much nicotine was needed in the body. And, the Barry experiment reveals that a person of ordinary skill would know to read the package insert for the Transderm®–Nitro

patch to determine how much nicotine he could fit inside the existing Transderm®–Nitro patch. Thus, a person of ordinary skill could create a transdermal nicotine patch exactly as described in Claims 1 and 2 of the '652 patent, using existing transdermal patches, as suggested by the Fox letter. While such a patch may not perform well, such a patch would succeed in delivering nicotine to the bloodstream through the skin. Plaintiff's arguments regarding the performance of such a patch are irrelevant. Therefore, this Court concludes that the Fox letter enabled a person of ordinary skill to create the invention described in Claims 1 and 2 of the '652 patent.

## H. The PTO Ruling

The Court's decision is buttressed by a recent ruling from the PTO which held that the Fox letter is an anticipatory reference for claims for a nicotine patch. Gillis Second Aff. Ex. 2 (hereinafter "PTO Ruling at __"). The '652 inventors have claims pending which are directed to the delivery of nicotine from a transdermal patch. The PTO rejected these claims as anticipated by the Fox letter. The Examiner held:

> Fox teaches a number of delivery routes for the drug alkaloid nicotine, one of which is transdermal application much in the manner of nitroglycerine and scopolamine patches. While Fox does not expressly include the details of the nitroglycerine or scopolamine patches to be used in the transdermal application of alkaloid nicotine ... it would have been obvious to one of ordinary skill in the art to employ the conventional scopolamine patch ... as is expressly suggested by Fox.

PTO Ruling at 5–6 (citations omitted).

The Examiner then went on to specifically reject arguments made by the plaintiff—identical to the arguments made in this case—that the Fox letter is too vague or speculative because it does not indicate whether (1) using an existing patch would be operative; (2) using an existing patch would

---

**8.** Plaintiff points to prior art which indicated that smokers were addicted not just to nicotine, but to the "bolus" of nicotine quickly delivered to brain receptors by a cigarette. Jarvis Del. ¶ 8. At the time, it was believed that rapid absorption of nicotine was critical to the addiction. *Id.*

deliver the correct dosage of nicotine to satisfy a smoker's demand for nicotine; and (3) using an existing patch would deliver the nicotine, not only in the desired dosage, but with sufficient rapidity to satisfy a smoker. PTO Ruling at 6. The PTO rejected each of these arguments as "generally non-sensical":

> While anticipation and obviousness require that the prior art teach an operative apparatus, there is no requirement concerning the quality of operation of such apparatus. Inasmuch as Fox explicitly suggests the placement of alkaloid nicotine within a transdermal patch, and the resulting patch would be capable of delivering some amount of nicotine to a user, whether such an amount would be ineffective, inferior to the amount provided by the instant invention, or toxic to the user, the resulting apparatus would be capable of enabling transdermal application of some amount of nicotine to the bloodstream of the user, which is all the operability that is required. Whether this amount is considered by Applicants to be "the correct dosage of nicotine to satisfy a smoker's demand for nicotine," or "not only in the desired dosage, but the sufficient rapidity to satisfy a smoker" is not relevant to whether the Fox apparatus would be operative in enabling transdermal application of some amount of nicotine to the bloodstream of the user. Applicants' comment that Fox "does not indicate whether any of the techniques would be operative" is irrelevant to whether such a transdermal patch would be operative, and is generally non-sensical.

PTO Ruling at 6–7.

In finding the invention to be anticipated, the Examiner specifically recognized that extrinsic evidence can be used to explain, but not expand, upon the Fox letter. PTO Ruling at Note 2. The Examiner said: "Evidence extrinsic to the single reference ... may be relied upon to explain, but not expand upon, the meaning of a phrase or term within such single reference, such as "scopolamine patches." (Citing *Baxter Travenol* and *Scripps Clinic*).

This Court agrees with the PTO that the Fox letter is neither too vague nor too specu-

lative to anticipate the '652 patent. The Fox letter taught a person of ordinary skill how to make a transdermal patch for the delivery of nicotine to the body using existing transdermal patches. The fact that such a patch may not work very well is irrelevant. It is undisputed on this record, that a person of ordinary skill could make a patch that would deliver some amount of nicotine to the bloodstream using existing transdermal patches. Therefore, this Court concludes that the Fox letter anticipated claims 1 and 2 of the '652 patent.

### I. Claims 4, 5, and 7 of the '652 Patent

██ Claim 4 of the '652 patent describes a transdermal patch that can deliver nicotine to the "bloodstream at a rate sufficient to correspond to the nicotine level in the blood achieved by smoking." Dr. Barry attested that he could look at the literature concerning NICORETTE gum and determine the nicotine level in the blood achieved by smoking, which is thirteen to fourteen nanograms of nicotine per milliliter of blood. Barry Aff. at 6–7. Moreover, Dr. Barry attests that the existing Transderm®–Nitro patch was large enough to deliver thirteen to fourteen nanograms of nicotine per milliliter of blood. Barry Aff. at 13–14. Thus, Dr. Barry stated he could not only make a patch that delivers some quantity of nicotine to the bloodstream, but he could make a patch that delivers that same amount of nicotine that is achieved by smoking using existing transdermal patches. Barry Aff. at 14. The plaintiff introduced no evidence to challenge this claim.

Thus, this Court concludes that the Fox letter taught a person of ordinary skill to make a nicotine patch that would deliver nicotine to the "bloodstream at a rate sufficient to correspond to the nicotine level in the blood achieved by smoking" as described in Claim 4 of the '652 patent. Therefore, this Court finds the Fox letter anticipated Claim 4 of the '652 patent. Because Claims 5 and 7 depend from Claim 4 and thus contain all of the limitations of Claim 4, this Court finds Claims 5 and 7 of the '652 patent are also anticipated by the Fox letter.[9]

9. Because this Court finds the '652 patent invalid      under Section 102(b), it need not address the

## CONCLUSION

In sum, defendants have demonstrated no genuine issue of material fact exists that the Fox letter disclosed in a printed publication more than a year prior to the filing of the '652 patent a method for making a transdermal nicotine patch using an existing transdermal patch. Plaintiff offered no evidence to dispute the testimony of Dr. Barry that: "The Fox letter expressly teaches one to put nicotine into an existing patch. One skilled in the art could simply follow this teaching by substituting nicotine for nitroglycerin in the Transderm®–Nitro patch and arrive at exactly the patch of Claims 1 and 2 of the '652 patent." Indeed, the prosecution history of the '652 patent supports reliance and use of the Transderm®–Nitro patch. Thus, defendants have proved by clear and convincing evidence that the Fox letter both identifies and enables a person of ordinary skill to create a transdermal nicotine patch to aid people in quitting smoking. Therefore, this Court concludes that Claims 1, 2, 4, 5 and 7 are invalid under 35 U.S.C. § 102(b) as anticipated by the Fox letter.

An appropriate order is attached.

### ORDER

In accordance with the Court's Opinion filed herewith,

It is on this 5th day of October, 1994.

ORDERED that the motion of defendants Alza Corporation and Marion Merrell Dow Inc. for summary judgment declaring the '652 patent invalid under 35 U.S.C. § 102(b) is granted.

issue of whether the patent is obvious under section 103.